824 So.2d 1222 (2002)
Iris GARNIER
v.
ORLEANS PARISH SCHOOL BOARD.
No. 2001-CA-0860.
Court of Appeal of Louisiana, Fourth Circuit.
July 31, 2002.
*1224 Larry Samuel, Rittenberg & Samuel, LLC, New Orleans, LA, and Joseph G. Albe, Joseph G. Able, Attorney at Law, Metairie, LA, for Plaintiff/Appellant.
James M. Taylor Lynn L. White Taylor, Wellons, Politz & Duhe, APLC, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR.).
PATRICIA RIVET MURRAY, Judge.
This is a workers' compensation case. The employee-teacher, Iris Gamier, appeals a judgment of the Workers' Compensation Judge (WCJ) rejecting her claims and granting a credit for Gayle pay to her employer, the Orleans Parish School Board ("OPSB").[1] For the reasons that follow, we affirm.

FACTS
This case arises out of an uncontested work-related accident that occurred on August 28, 1997, during the first week of the school year. On that date, Ms. Gamier was employed by the OPSB as a mild-moderate special education teacher at Valena C. Jones Elementary School. When the students were lining up in her classroom to go home at 2:59 p.m., a larger female student, who was about 5'8" to 5'9", began wielding pencils in the direction of the eyes of a smaller male student, who was about 5'3" to 5'4". After unsuccessfully orally attempting to diffuse the fight, Ms. Gamier physically restrained the female, pencil-wielding student. Unexpectedly, the female student jerked away from Ms. Gamier, causing her to fall backwards and to injure her lower back, left leg and left knee. Ms. Garnier indicated that a neighboring teacher and aide came to her rescue and may have witnessed her accident; however, the only witness at trial was Ms. Gamier.
At trial, Ms. Gamier described the accident as follows:
Well, when I was knocked across the room by the student, my body, like, hit up against the low desk. I heard a crack in my back, a noise, like a popping noise. My left knee hit up against the desk; and I hit my right knee on the floor or very close to the floor, certainly near the desk; and I hung on and I tried to pull myself up to get back to stop the fight.
She further testified that after dismissing her class she went to the principal's office and completed an accident report.
From September 5, 1997 through February 11, 1998, Ms. Garnier's injuries were treated by her physician of choice, Dr. Earl Rozas, an orthopedic surgeon. During this period, Dr. Rozas saw her on a regular basis and on each visit found her steadily improving. Dr. Rozas found that "she was not allowed to work" during the time that he was treating her. On her last visit, February 11, 1998, he discharged her *1225 to work as a special education teacher with OPSB. In so doing, he imposed a limitation against heavy lifting and noted she may occasionally need muscle relaxant and pain medication.
Based on Dr. Rozas' opinion discharging Ms. Gamier to return to her previous position, OPSB, which is self-insured, discontinued paying workers' compensation benefits in February 1998.[2] In May 1998, Ms. Gamier filed the instant disputed claim, seeking indemnity benefits, medical treatment, and vocational rehabilitation. She also sought penalties and attorney's fees for OPSB's arbitrary and capricious conduct.
Before the WCJ, Ms. Gamier raised five issues: (1) her entitlement to workers' compensation benefits (temporary total disability (TTD) and/or supplemental earnings benefits (SEB)); (2) her entitlement to medical treatment, including mileage expenses; (3) her entitlement to penalties and attorney's fees; (4) the WCJ's lack of subject matter jurisdiction to rule on OPSB's claim for a credit or offset against the Gayle pay she received; and (5) assuming such jurisdiction, the OPSB was not entitled to such a credit or offset.[3]
Answering, the OPSB asserted several defenses. First, it asserted the right pursuant to La. R.S. 23:1206 to reduce Ms. Garnier's benefits for the physical contact and Gayle pay it paid her. Second, it asserted the right to a credit for those same amounts under La. R.S. 23:1225. Finally, it asserted a forfeiture defense under La. R.S. 23:1208 based on her misrepresentations.
Before trial, the WCJ denied Ms. Garnier's motion for summary judgment, and, pursuant to La. R.S. 23:1124.1, appointed an orthopedic expert, Dr. Melvin Manning, to evaluate Ms. Gamier and to review her medical records.[4]
At trial, the sole witness to testify live was Ms. Gamier. The parties introduced a plethora of medical records and depositions of the health care providers who treated her. The parties stipulated that from the date of the accident through January 7, 1998, Ms. Gamier was paid her full salary; as discussed below, this was physical contact pay under La. R.S. 17:1201(C)(1)(b). For the remainder of that school year, she was paid her salary minus fifty dollars a daythe amount paid for a substitute teacher; this was Gayle pay. For the 1998-99 school year, she was paid $998.99 bi-weekly, which again was Gayle pay, representing her salary less the cost of a more experienced substitute teacher. For a six-week interval from January to February 1998, she also collected workers' compensation. As mentioned, OPSB discontinued paying workers' compensation when Ms. Garnier's treating physician, Dr. Rozas, discharged her to return to work on February 11, 1998. It was also stipulated that on May 1, 1999, Ms. Gamier retired based on her thirty-two years of service, not on disability.[5]
The WCJ rejected Ms. Garnier's claims and found the OPSB entitled to a credit *1226 for Gayle pay. In so doing, the WCJ made the following rulings:
 Claimant's right to indemnity ended in February of 1999 when she was released to return to work by Dr. Earl Rozas; and
 Although claimant's veracity was questionable, there is no finding of claimant's having willfully made a false statement in order to obtain benefits. Therefore, claimant has not forfeited her right to workers' compensation benefits. However, due to this lack of veracity, claimant has not carried her burden of proof as to any additional workers' compensation benefits after her release to return to work in February of 1999; and
 Defendant did controvert claimant's right to the unpaid medical expenses and indemnity benefits. Therefore no penalty nor attorneys fees are owed on this issue; and
 This OWC Court does have subject matter jurisdiction to decide the issue of any off-set or credit for "Gayle Pay"; and
 Defendant is entitled to receive an offset or credit for any "Gayle Pay" received by claimant from defendant.
 Costs are assessed equally between the parties and Expert witness fees are to be split in half each between the parties; and
 Any other issues raised but not specifically granted herein are DENIED.
From that judgment, Ms. Gamier appeals seeking the following relief:
1) TTD benefits at the maximum rate from August 28, 1997 (the date of the accident) to the present and continuing until modified by the OWCA.
2) Or alternatively, TTD benefits from August 28, 1997 at the maximum compensation rate until January 28, 1998, and then SEB at the maximum rate allowed by law without offset, through present and continuing until modified by this court or operation of law (payment of 520 weeks of benefits);
3) The defendant had no reason for denying disability benefits and/or medical benefits and did not reasonably controvert those benefits due and thus should be assessed statutory penalties and attorney's fees under La. R.S. 23:1201(E) and La. R.S. 23:1201.2, respectfully.
4) No offset or credit is due to OPSB.

DISCUSSION
The primary dispute presented in this case centers on the correctness of the WCJ's factual finding that Dr. Rozas's discharge dateFebruary 11, 1998was the date Ms. Garnier's disability ended and her right to workers' compensation benefits terminated.[6] Ms. Gamier contends that pivotal factual finding was manifestly erroneous. To resolve that dispute requires we review the extensive evidence presented at trial in this matter.
As noted, Ms. Gamier was the sole live witness at trial. Although she acknowledged signing a form designating Dr. Rozas as her choice of physician for this work-related accident, she disagreed with several statements in Dr. Rozas' records. Particularly, she disagreed with Dr. Rozas' records reflecting that during the time she saw him her injuries progressively improved. To the contrary, she portrayed herself as persistently in pain since the day of the accident. Indeed, she listed her pain as one of the major reasons she is *1227 unable to return to work.[7] She also stated that her fear of being the subject of another student attack renders her unable to return to her prior job.
Ms. Gamier has not returned to work since the accident. She testified that she planned to work for forty years, but the accident in question rendered her disabled and caused her to have to take an early retirement based on her over thirty years of employment. She testified that before the accident she had no mental or physical health problems and did low impact aerobics three or four times a week. She acknowledged, however, that she had a bout of depression in 1997 before the accident, which she attributed to the death of a relative, and that Dr. Palazzo diagnosed and prescribed medication, Zoloft, for that depression. She also acknowledged two prior work-related accidents: a 1990 incident involving lifting a child from a wheelchair, and a 1996 motor vehicle accident.
Since the accident, Ms. Gamier has visited numerous doctors, undergone numerous tests, and received numerous treatments. As noted, a plethora of medical records as well as depositions of her various health care providers were introduced. Taken in chronological order, the medical evidence is as follows.

Dr. Laurie Palazzo:
Ms.Garnier telephoned Dr. Laurie Palazzo, her general practitioner, shortly after the accident. Dr. Palazzo had been treating Ms. Garnier for a prior back injury arising out of a March 1996 work-related, motor vehicle accident. Indeed, Dr. Palazzo's records reflect that Ms. Garnier was being treated just days before the accident in question for low back pain arising out of that prior motor vehicle accident. Nonetheless, on this occasion, according to Ms. Garnier, Dr. Palazzo told her that she no longer treats patients that were injured on the job, called in a prescription for pain medication to the pharmacy for her, and instructed her to see a specialist.

Dr. Earl Rozas:
The first specialist Ms. Garnier was able to get an appointment with was Dr. Earl Rozas, an orthopedic surgeon. Dr. Rozas first examined Ms. Garnier on September 5, 1997, at which time she complained of a back injury the previous week and related that "she had felt something pop in her back." At that time, her chief complaints were low back pain and bilateral leg pain. Based on his examination, Dr. Rozas' initial impression was that she sustained an acute lumbosacral strain; he found nothing to suggest any neurological involvement. Dr. Rozas prescribed muscle relaxants, gave her a cortisone injection, fitted her with a back brace, and referred her to physical therapy.
On September 12, 1997, Dr. Rozas again examined Ms. Garnier and found she was "somewhat improved." She, however, still had tenderness of the lumbar muscles and painful range of motion; he thus added pain medication, hot soaks, and continued the physical therapy program. By September 19, 1997, when he saw her again, he found she was "much improved." She, however, still complained of some lumbar spine tenderness, but significantly less than before, and he continued her on medication and the physical therapy program. When she was next seen on October 10, 1997, he found she was improving clinically and symptomatically. Although her back had improved, she complained of left knee and ankle swelling. Dr. Rozas found that *1228 she had some knee synovitis and a lumbar strain and continued her on the physical therapy program.
On October 31, 1997, she reported that her back was better and her knee swelling had decreased. Given her continuing improvement, Dr. Rozas referred her to a work conditioning program in preparation for return to work. Ms. Garnier, however, returned to Dr. Rozas on December 3, 1997, complaining of a flare up of back pain; he advised her to take a week off of the work conditioning program. On December 9, 1997, Ms. Garnier presented appearing somewhat better, yet still complaining of much back pain, especially from participating in the work conditioning program. Dr. Rozas testified that he "felt the patient was somewhat accentuating or exaggerating her symptoms." Nonetheless, he decided to keep her off the work conditioning program, as she had not been very cooperative with that program, and to place her on home exercises twice daily. When he saw her again on December 16, 1997, he noted that she was doing better with the home exercises than she had done with the work conditioning program; at that time, he started her on some hourly flexibility exercises.
Meanwhile, on January 6, 1998, Dr. Rozas met with Ms. Garnier's case worker, Katherine Linam, to discuss Ms. Garnier's medical status. Dr. Rozas agreed that Ms. Garnier could return to work as a school teacher with certain restrictions, but expressed concern with her being exposed to further injury when dealing with students. Ms. Linam response was that "Ms. Garnier's job in any teacher capacity would involve students, and no guarantee of an altercation not occurring could be given."
On January 14, 1998, Ms. Garnier returned to Dr. Rozas complaining of back pain after spending the greater portion of the day at the shopping mall.[8] On this visit, Ms. Garnier was accompanied by her case worker, Ms. Linam. The trio discussed Ms. Garnier's work duties as a special education teacher and reviewed an extensive job analysis that had been prepared outlining an OPSB special education teacher's job duties. Dr. Rozas opined that Ms. Garnier was capable of performing all the functions that would be required of her with one exception having to do with heavy lifting; he indicated that she could not do the occasionally required heavy lifting and that this would have to be done either by students or other faculty members. Ms. Linam agreed that such assistance would be provided. At the end of their discussion, the trio cooperatively decided to obtain an MRI of Ms. Garnier's lumbar spine so that Dr. Rozas could make a definite diagnosis and rule out any possible disc or nerve root compression that would account for her complaints. Dr. Rozas indicated that he had not ordered an MRI previously because he had not suspected any neurologic disorder and that the MRI was ordered out of an abundance of caution and for "completeness."
On February 4, 1998, the MRI was done. The results of the MRI revealed no disc protrusion or spinal stenosis. Simply stated, Dr. Rozas viewed the MRI results as within normal limits for a woman of Ms. Garnier's age (fifty-four years old) and *1229 weight (mildly obese). On February 11, 1998, Dr. Rozas reviewed the MRI results with Ms. Garnier and her case worker, discharged her from his regular care, and opined that she could "return to her previous work duties" with OPSB as a special education teacher, subject to the heavy lifting restriction. Dr. Rozas also noted that "she will continue to require on an as needed basis an occasional muscle relaxant at night time and an occasional pain medication."
Overall, Dr. Rozas described Ms. Garnier's course of treatment as one of steady improvement. He testified that during that six month course of treatment, she never needed a cane or walker to assist her with walking, not even after her initial acute injury. As to her disability status, Dr. Rozas testified that from the date of the accident until the date he discharged her, "she was not allowed to work."

James Schiro:
James Schiro, a licensed occupational therapist, did the initial assessment of Ms. Garner for the work conditioning program to which Dr. Rozas referred her. Mr. Schiro testified that the functional capacity evaluation (FCE) indicated that Ms. Garnier was in the sedentary-light category, which is below the light physical demand category generally required for teachers. Mr. Schiro, however, noted that her behaviors indicated "some symptom exaggeration and some less than maximal effort," casting doubt on the accuracy of the FCE measurement of her functional abilities. Mr. Schiro further noted that Ms. Garnier's noncompliance with the program was attributable to her tardiness and absenteeism. Following Dr. Rozas' placing her on hold from the program for a week to rest in early December 1997, Mr. Schiro had no further communications with Ms. Garnier.

Barrett Richter, D.C.:
From January 1998 through June 1998, Ms. Garnier, apparently on her own initiative,[9] received chiropractic treatment from Barrett Richter, D.C. When he first examined her, she complained of low back, left knee, and left ankle pain, lower extremity paresthesia and several falls due to her left leg collapsing. During her treatment with Dr. Richter, electrodiagnostic testing was done and revealed bilateral sensory neuritis. Dr. Richter noted that her February 4, 1998 MRI scan revealed minimal bulging of L3-4 and L1-2 discs. A second opinion reading of that same MRI was performed on February 22, 1998 and revealed moderate disc dehydration at L2-L3 and mild diffuse disc bulging at L4-L5 and L5-S1. Dr. Richter concurred with that MRI report.
In his final report dated June 25, 1998, Dr. Richter diagnosed her as having: 1) lumbosacral sprain/strain with associated vertebral subluxation complex, 2) sensory neuritis, 3) disc bulges at L4-L5 and L5-S1, 4) knee, leftsprain/strain, 5) ankle, leftsprain/strain. Dr. Richter opined that Ms. Garnier was temporary totally disabled from work from January 12, 1998 (date of first visit) to July 27, 1998. Dr. Richter found that she sustained a soft tissue injury to her back, knee, and ankle that was complicated by a sensory neuritis and two disc bulges in the lumbar spine, and related her injuries to the August 28, 1997 accident. Dr. Richter recommended that Ms. Garnier see either a neurosurgeon or a pain management specialist.

Dr. Michael Hunter:
In June 1998, Dr. Michael Hunter, a general practitioner, examined Ms. Garnier. *1230 Her chief complaints were falling secondary to dizziness and weakness in her left leg, numbness in her left lower extremities, and intermittent sharp pains from her left knee to her left heel that prohibited her daily activities. According to Dr. Hunter's report, prior to this injury Ms. Garnier was doing aerobic exercises three times a week and very active; she appeared very depressed and frustrated at the time of this examination and requested a handicap license plate because it had become difficult for her to walk to the grocery store. Dr. Hunter authorized the handicapped plate, referred her to Dr. David Jarrott (a neurosurgeon), and found her unable to work pending Dr. Jarrott's evaluation. According to a later report, Dr. Hunter found Ms. Garnier had depression, dizziness due to trauma, sensory neuritis, and was temporarily totally disabled for a period of twelve to twenty-four months.

Dr. David Jarrott:
From April 27, 1998 to November 10, 1998, Dr. Jarrott, a neurosurgeon, treated Ms. Garnier. On the initial visit, Dr. Jarrott found Ms. Garnier was disabled for twelve to twenty-four months due to symptomatic lumbar disc disease; this finding was based in part on her description of the physical demands associated with teaching special education students. On that initial visit, she complained of low back pain and stiffness, dizziness, and of her left leg giving away. She related these symptoms to the August 28, 1997 incident when she "twisted her back and fell."
Dr. Jarrott reviewed the lumbar MRI and x-rays taken February 22, 1998, and found they revealed a mild bulging disc with moderate dehydration or early degeneration of the L2-3 disc. Dr. Jarrott diagnosed her as having post-traumatic lumbar insufficiency or chronic failed back syndrome not in need of surgery. He recommended that she lose weight and begin a spine rehabilitation program. Dr. Jarrott related her injuries to the on-the-job accident based on the fact "she got worse month by month, and by September was walking with a walker and had experienced collapse of the legs three or four occasions." He acknowledged that in examining her he noted "an exaggerated sensitivity of the back muscles and ligaments," but found she continued to have severe pain and gave a history of that pain beginning with the August 28, 1997 injury. He further noted that she gave a past history of one prior back injury in 1990, picking up a child from a wheelchair at work, but indicated that injury only lasted about three weeks.
Explaining the nature of Ms. Garnier's disability, Dr. Jarrott testified that as a result of the on-the-job twisting injury, she sustained a soft tissue injury for which surgery is not required but which formed the organic basis for her chronic pain complaints, after a period of six months such pain becomes a "separate or superimposed chronic pain syndrome" or "a complication of the underlying condition." Such complication, he stated, is "one that requires different management of mainly pharmacological or drug management." He opined that he was clearly convinced she had chronic pain syndrome since her pain lasted for over six months. As to her current disability, he testified that she is currently disabled from her job as a special education teacher given the physical exertion required for such job, but opined that "[s]he would be capable of sedentary work elsewhere."

Dr. Mark Kruse:
In response to the opinions of disability voiced by Ms. Garnier's chiropractor, Dr. Richter, OPSB obtained its own chiropractor, Dr. Mark Kruse, to conduct an independent chiropractic examination. Dr. *1231 Kruse examined Ms. Garnier on two separate occasions.
Dr. Kruse first examined Ms. Garnier in February 1998. She complained to him of neck stiffness, secondary to inactivity because of her low back pain, knee, ankle pain and swelling. Based on his exam, his impressions were three-fold. First, she had a positive Waddell's sign and negative Mannkopf's test, which he noted is a strong indication of non-organic signs of pain and symptom magnification. Second, he found she could return to work at full duty capacity. Third, he found that passive care such as physical therapy modalities was no longer indicated.
In December 1998, Dr. Kruse examined her for a second time. On this occasion, he noted that she was using a walker and accompanied by a friend. While he was performing the orthoscopic examination, Dr. Kruse questioned Ms. Garnier about a buzzing noise. Although she initially denied it, she eventually admitted to secretly recording the exam. Dr. Kruse again found Ms. Garnier able to return to work at full duty without limitations. Although he was informed that she sustained an interim fall at home on June 6, 1998, when her left leg collapsed and for which she was treated at Jo Ellen Smith emergency room, Dr. Kruse opined that such fall was unrelated to the August 28, 1997 injury. He further found that there was still "strong evidence of nonorganic pain and symptom magnification" and that there were several inconsistencies in Ms. Garnier's examination which were "strongly indicative of nonorganic pain or symptom magnification." He further noted she engaged in "excessive and inappropriate grimacing and groaning" while he was examining her.

Dr. James C. Butler:
In May 1998, Dr. Butler, an orthopedic surgeon at Tulane Medical Center, first saw Ms. Garnier. He noted no objective findings. He reviewed the February 4, 1998 MRI and felt that it was essentially normal with the exception of some minimal bulging at the L3-4 and L1-2 levels. He stated that he did not know what sensory neuritis was and that this was not a term used in the orthopedics field. Given that Ms. Garnier lacked any objective evidence of injury, he opined there were no contraindications from an objective standpoint to her returning to work and no objective evidence of injury or disability. He felt that she could return to her job as a schoolteacher. Although at the time she saw Dr. Butler she was still treating with Dr. Richter, Dr. Butler opined that more probably than not further chiropractic treatments would not improve her condition.
In June 1998, Dr. Butler, at the OPSB's request, reviewed additional reports from Dr. Jarrott. Asked whether there was any explanation for Dr. Jarrott's opinion that she was disabled for twelve to twenty-four months due to symptomatic lumbar disc disease, Dr. Butler responded that he did not know of any. As to whether he would give Ms. Garnier the benefit of the doubt that she is experiencing pain, Dr. Butler replied that he would question whether she was experiencing pain based on the results of her functional capacity evaluation that suggests very strongly that she was exaggerating or magnifying her symptoms. Although he acknowledged that he could not disprove she was in pain, Dr. Butler stated "one would question the amount of pain she claims to feel."

Dr. Carlos Gorbitz:
In July 1998, at the OPSB's request, Dr. Carlos Gorbitz, a neurosurgeon, examined Ms. Garnier and reviewed various medical records. On the day of the exam, Dr. Gorbitz stated that Ms. Garnier was using a cane and limping. He further stated *1232 that she complained of pain in her low back and knee, which were the sites of her initial injury, and intermittent swelling of her left knee and ankle and pain in the sole of her foot. She mentioned a 1990 back injury lifting a child from a wheelchair. Dr. Gorbitz noted that when he asked her to stand on her tiptoes, she did so with marked difficulty and in a very peculiar fashion. Further elaborating, he stated it was "very peculiar because she will carry her own weight but she was kind of tiptoeing and balancing and losing her balance""balancing and pirouetting back and forth"and that this appeared to be an attempt to impress him with "some kind of neurological deficit." Dr. Gortitz found "no medical neurological reason for her not to return to work" and was "surprised in the absence of any neurological findings or radiological abnormalities that she had been unable to work for a year." Finally, he noted that "[t]he most important thing in this case is that the alleged symptoms that she presented, they don't match with any decent neurological examination and they don't match with the radiological abnormalities which are the strong objective findings."

Dr. Charles Billings:
On April 5, 1999, Ms. Garnier saw Dr. Charles Billings, an orthopedist, with complaints of persistent low back pain, which had not responded to physical therapy. Dr. Billings' diagnosis was chronic lumbar strain based on history related by the patient and found her temporarily unable to return to full activities.

Dr. Lionel Guillaume:
Given her problems since the date of the accident with pain, flashbacks, and nervousness, Ms. Garnier testified that her general practitioner referred her to Dr. Lionel Guillaume, a psychiatrist, and that she had seen him five or six times. Dr. Guillaume summarized her psychiatric condition as consistent with major depression and in January 1999 treated by prescribing Zoloft. Dr. Guillaume also referred her to Touro Pain Clinic.[10]

Dr. Richard Morse:
On her attorney's referral, Ms. Garnier saw Dr. Richard Morse, the Director of Touro Center for Chronic Pain and Disability Rehabilitation, on March 23, 2000. Dr. Morse performed a chronic pain evaluation. In the evaluation report, Dr. Morse gave as her neuropsychiatric diagnosis: "Major depressive disorder with suicidal thoughts, insomnia, nighttime awakening, recurrent tearfulness and diminished view of the future, as well as personality changes of irritability" and that "[s]he shows concomitant signs of anxiety and fear." In that report, Dr. Morse outlines a pain management program for her, which includes an initial five to ten day inpatient program (due to her severe deconditioning and her very unstable walking and gait) and a gradual progression to an outpatient program. He ended his report by emphasizing her "very healthy past history, physically and emotionally." Ms. Garnier testified that she was willing to attend that program, but OPSB had refused to pay for it.

Dr. Melvin Manning:
As noted above, the WCJ appointed Dr. Melvin Manning to examine Ms. Garnier and to review her medical records. On July 24, 2000, Dr. Manning examined her and noted that she was ambulating with a walker. Her primary complaints to him were "low back pain which is referred to her left knee and occasionally the ankle *1233 with altered sensation which interferes with activities of daily living." She also complained that since the accident she suffered from chronic pain with periodic episodes of depression.
Dr. Manning listed in his report about a dozen different medications that Ms. Garnier reported taking. He noted that the records he reviewed indicated she reported no significant pain relief from the chiropractic treatment she received. He further noted that Dr. Rozas was the first doctor that she actually saw dating back to September 5, 1997 for the injury she sustained on August 28, 1997 and that after a period of treatment Dr. Rozas opined on February 18, 1998 that she could return to her previous employment "despite the occasional need for muscle relaxant and pain medication."
Based on his own examination of Ms. Garnier, who he described as being "in no acute distress," and his review of the medical records, Dr. Manning gave the following opinion:
Ms. Garnier has a chronic pain syndrome which is specific for the lumbar region. The time of onset for this behavior illness pattern is one that fits for August 1997 based on her subjective complaints. However, I also believe that she had a pre-existing condition which was exacerbated by the work related incident which occurred on said date. Although I see no objective data to support the length of her total disability, upon her degree of behavior illness I do not believe she is able to return to her former work as a Special Ed teacher. I see no reason why she should not be able to return to the work force in a sedentary fashion. That is to say a sedentary work load should be within her capabilities. I strongly agree with the previous medical evaluation which recommended an inpatient psychiatric treatment program with progression to an outpatient basis might help break this behavior illness pattern and allow her to re-enter the work force.
Despite Dr. Manning's opinion, the WCJ, stressing Ms. Garnier's lack of veracity as a factor, found her entitlement to workers' compensation benefits terminated in February 1998, when Dr. Rozas released her to return to work.
Ms. Garnier first argues that the WCJ manifestly erred in failing to give greater weight to her treating physician, who she identifies as Dr. David Jarrott. OPSB counters that Ms. Garnier's characterization of Dr. Jarrott as her treating physician is inconsistent with the fact that he did not see her until April 1998, eight months after the accident, which was after she had been released to return to work by Dr. Rozas, her selected orthopedist, in February 1998. OPSB further argues that this court rejected a similar attempt to give greater weight to a subsequent, more favorable physician's findings by simply labeling that physician as the "treating" one in Holloway v. Hilton Hotels Corp., 99-2393, 99-2394 (La.App. 4 Cir. 9/15/99), 743 So.2d 797. We agree.
As OPSB argues, there is nothing magical about labelling one of a line of doctors as the "treating" one. It follows then that Ms. Garnier's labeling Dr. Jarrott as her "treating physician" does not warrant a finding that the WCJ was manifestly erroneous in refusing to afford more weight to Dr. Jarrott's testimony regarding her inability to return to work. As we held in Holloway, supra, the WCJ was free to disagree with Ms. Garnier's classification of one of a line of physicians as the treating one.[11]
*1234 Ms. Garnier next argues that the WCJ was manifestly erroneous in failing to find that she was entitled to any additional workers' compensation benefitsTTD or SEBafter Dr. Rozas released her to return to work. Entitlement to weekly workers' compensation benefits hinges upon a worker's proof of a disabling work-related injury, whether temporary or permanent. Parker v. National Linen Service, 95-0500 (La.App. 4 Cir. 3/14/96), 671 So.2d 963. A worker seeking temporary (TTD) must prove by clear and convincing evidence that he or she is unable to engage in any gainful occupation, whether or not the same type of work he or she was engaged in at the time of injury. La. R.S. 23:1221(1)(c). A worker claiming entitlement to (SEB) based on a partial disability must prove partial disability as a result of work-related injury and the inability to earn 90% of the wages he earned before the injury. Parker, supra.
Ms. Garnier's claim for TTD benefits is wholly unsupported. Even Drs. Jarrott and Manning opined that she was capable of performing sedentary work. She is not entitled to TTD benefits after February 1998.
Ms. Garnier also seeks SEB based on her claim that she is unable to return to her former job because of her chronic pain syndrome and her concomitant need of pain management; she contends that she is currently "disabled as a result of her constant and severe pain." In support of that claim, she relies upon the reports and deposition testimony of Drs. Guillaume and Morse. Particularly, as noted above, Ms. Garnier was evaluated on March 23, 2000, by Dr. Morse who diagnosed her as suffering from major depressive disorder, post-traumatic stress disorder, and constant pain syndrome, all causally related to the accident. Dr. Morse also mapped out an extensive treatment plan, which included an initial inpatient stay followed by an outpatient program. Ms. Garnier stresses that OPSB has refused to respond to her two demands for it to pay for that program. Given Dr. Morse's findings, she argues that it is plausible that even if her pain is entirely psychosomatic, it is directly attributable to the work-related injury and thus compensable.
We view Ms. Garnier's claim to be that she actually feels pain even assuming there is no longer a physical basis for it and that such subjective pain disables her. The central disability issue in this case is thus whether Ms. Garnier's initial physical injury can be viewed as giving rise to a compensable mental injury. This type of claim is referred to in the jurisprudence as a "physical/mental" claim and is codified in La. R.S. 23:1021(7)(c), which provides:
Mental injury caused by physical injury. A mental injury or illness caused by a physical injury to the employee's body shall not be considered a physical injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence.[12]
Applying that standard, "the court must proceed with extreme caution and *1235 exercise extreme care in view of the nebulous characteristics of such a condition and the possibility of the symptoms being easily feigned." Jordan v. Southern Natural Gas Co., 455 So.2d 1217, 1222 (La.App. 2d Cir.1984). As a commentator points out, "[t]he courts have usually denied benefits in mental disability claims based on the court's finding that the claimant has not been truthful to the court or the psychiatrist whose opinion was based on inaccurate information given by the claimant. The courts have also shown a reluctance to find a compensable mental disability where the physical impact was minor." 1 Denis Paul Juge, Louisiana Workers' Compensation § 8:6 (2d Ed.2002)(Emphasis supplied).
Ms. Garnier's failure to be truthful to the WCJ strongly supports its implicit rejection of her mental claim. The WCJ expressly noted that Ms. Garnier lacked veracity and "due to this lack of veracity" found that she had not "carried her burden of proof as to any additional workers' compensation benefits after her release to return to work" in February 1998.[13] We cannot find, as Ms. Garnier contends, that this finding was manifestly erroneous.
The WCJ's finding that Ms. Garnier's disability ended in February 1998 was a factual finding. See Parker, 671 So.2d at 967 (determination of work-related disability is a factual finding). As such, it is governed by the manifest error or clearly wrong standard of appellate review. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706, 710; Bruno v. Harbert Intern. Inc., 593 So.2d 357, 361 (La.1992). Under that standard, when, as in this case, "the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible." Armond v. Starcastle Dinner Theatre, Inc., 98-711, pp. 6-7 (La.App. 5 Cir. 1/26/99), 726 So.2d 471, 474. The trier of fact's choice between two permissible views of the evidence cannot be considered manifest error. Parker, supra.
Applying that deferential standard, we cannot say that the WCJ's factual finding that Ms. Garnier's right to workers' compensation benefits ended in February 1998, when she was released to return to work by Dr. Rozas, was manifestly erroneous.[14]

GAYLE PAY CREDIT

Ms. Garnier's assignment of error regarding the credit issue is two-fold. First, she argues that the WCJ lacked subject matter jurisdiction to decide the credit issue. Second, in the alternative, she argues that, even assuming jurisdiction, OPSB was not entitled to any credit.
As to the subject matter jurisdiction issue, the Legislature resolved any doubt over this jurisdictional issue in 1997 by amending La. R.S. 23:1310.3(E) to provide *1236 that the WCJ has "exclusive jurisdiction over ... the determination and recognition of employer credits as provided in this Chapter." Juge, supra at § 3:9. When, as in this case, the employee's claim arises out of the Workers' Compensation Act, in that the parties have agreed and the WCJ has held that the employee suffered a work-related injury, the employer's claim for a credit is clearly a workers' compensation matter over which the WCJ has jurisdiction. See Thomas-Young v. Allen Parish School Bd., XXXX-XXXX, pp. 4-6 (La.App. 3 Cir. 3/8/01), 780 So.2d 1273, 1276-77, writ denied, XXXX-XXXX (La.6/29/01), 794 So.2d 815 (rejecting similar argument).
Turning to the merits, Ms. Garnier argues that, even assuming jurisdiction, the WCJ nonetheless erred in granting the OPSB a credit against the Gayle pay it paid to her. Before addressing this issue, we first must sketch the nature of the pay Ms. Garnier received during the relevant intervalfrom the day of the accident (August 28, 1997) to the date of termination of benefits (February 11, 1998).
In Boseman v. Orleans Parish School Bd., 98-1415 (La.App. 4 Cir. 1/6/99), 727 So.2d 1194, we outlined the three levels of pay the Legislature has provided for public school teachers in recognition of the fact that "public school teachers face increasingly greater risks in our society." 98-1415 at p. 5, 727 So.2d at 1197. Particularly, we explained that La. R.S. 17:1201(D) is the general provision that establishes the first level of protection, providing for weekly wage benefits under the workers' compensation law for a teacher who is injured or disabled while acting in her official capacity. La. R.S. 17:1201(C) is a special provision that establishes the second level of protection; this provision is "designed to provide extra compensation, in addition to the weekly wage benefits" under La. R.S. 17:1201(D) when a teacher is injured due to contact with a student. 98-1415 at p. 6, 727 So.2d at 1197. We further explained that the physical contact provision, La. R.S. 17:1201(C)(1)(b), "is the general provision, which applies in addition to weekly wage benefits, if the injury or disability which occurs while the teacher is acting in his official capacity is caused by any type of physical contact with a student, accidental or intentional." Id. The third level of protection, we noted, is provided by the assault pay provision, La. R.S. 17:1201(C)(1)(a), which provides for "additional compensation when the contact with a student which causes the teacher's injury is an assault and battery." Id.
In Boseman, supra, we were presented with a factual scenario that involved a battery. We commented that "[t]his was not a situation where a teacher simply came between two students who were fighting and got caught in the crossfire." 98-1415 at p. 7, 727 So.2d at 1197. Unlike in Boseman, the scenario involved in this case was one in which Ms. Garnier simply intervened between two studentsthe large, female pencil wielding student and the small, male studentwho were fighting and sustained injury as a result of that intervention. This case thus falls within La. R.S. 17:1201(C)(1)(b), the physical contact provision.
With that backdrop in mind, we find (based on the stipulations of the parties and Ms. Garnier's testimony) that she collected three types of benefits: (1) physical contact pay for the first ninety days in the amount of her full salary, (2) Gayle pay (salary paid to a teacher on extended sick leave less amount paid to substitute teacher) from that point forward, and (3) workers' compensation benefits for a six week interval overlapping the Gayle pay.[15]
*1237 Given that classification of the pay she received, we now address her contention that she was entitled to collect both workers' compensation benefits (TTD) and her full salary for the first ninety days. In support of that position, she relies upon the statutory language of La. R.S. 17:1201(C)(1)(b), which provides that a teacher entitled to physical contact benefits "shall receive sick leave for a period up to ninety days without reduction in pay and without reduction in accrued sick leave days while injured or disabled as a result of rendering such assistance." La. R.S. 17:1201(C)(1)(b)(Emphasis supplied). Ms. Garnier argues that the provision "without reduction in pay" includes workers' compensation benefits. We disagree. That argument ignores La. R.S. 17:1201(D)(1), another applicable statutory provision which provides that:
Any member of the teaching staff in the public schools who is injured or disabled while acting in his official capacity shall be entitled to weekly wage benefits under the worker's compensation law of the state of Louisiana and/or to sick leave benefits under Subpart B of Part X of this Chapter, at his option, but in no event shall such benefits exceed the total amount of the regular salary the member of the teaching staff was receiving at the time the injury or disability occurred.

La. R.S. 17:1201(D)(1)(Emphasis supplied). The highlighted language statutorily precludes duplicative recovery, which would result were we to accept Ms. Garnier's argument.
Ms. Garnier next argues that the WCJ erred in finding OPSB entitled to a credit against the workers' compensation benefits it owes for the Gayle pay she collected. In recognizing OPSB's right to a credit, the WCJ did not articulate any basis for its decision that a credit was appropriate; it neither provided any reasons for judgment, nor cited an applicable statutory provision. Although there are three statutory provisions that arguably could apply, we find that La. R.S. 17:1201(D)(1), which we discussed in connection with the physical contact pay, applies. As we held in connection with the physical contact pay, OPSB is entitled to a credit only to the extent that Ms. Garnier collected more than her pre-accident salary by contemporaneously collecting both workers' compensation benefits and Gayle pay. See Anderson v. Orleans Parish School Bd., XXXX-XXXX, p. 10 (La.App. 4 Cir. 8/1/01), 792 So.2d 943, 949, writ denied, 2001-2495 (La.12/7/01), 803 So.2d 37 (explaining credit calculation based on this statutory provision for assault pay). We thus find Ms. Garnier's argument that the WCJ erred in recognizing OPSB's right to such a credit unpersuasive.
We likewise find unpersuasive Ms. Garnier's final argument that the WCJ erred in denying her request for attorney's fees and penalties pursuant to La. R.S. 23:1201(E) and/or R.S. 23:1201.2. Ms. Garnier cannot prevail under La. R.S. 23:1201(E) given the employer reasonably controverted her claim based on the evidence it had that her own physician had released her to return to work and that several health care providers had opined that she was exaggerating her symptoms. Nor can Ms. Garnier prevail on her claim under La. R.S. 23:1201.2 given her inability to prove, as that provision requires, that the employer was arbitrary and capricious in failing to pay benefits and medical expenses. *1238 "`It would very rarely be appropriate for an appellate court to award attorney's fees based on employer actions which the trier of fact previously found did not rise to the level of being arbitrary and capricious (and in fact found to be meritorious).'" Willis v. Alpha Care Home Health, XXXX-XXXX, p. 2 (La.6/15/01), 789 So.2d 567, 568 (quoting J.E. Merit Constructors Inc. v. Hickman, 00-0943 (La.1/17/01), 776 So.2d 435). This is not such a rare case.

DECREE
For the foregoing reasons, we affirm the judgment of the Workers' Compensation Judge.
AFFIRMED.
TOBIAS, J., CONCURS WITH REASONS.
I respectfully concur with the opinion of majority in order to assign additional reasons relating to the issue of the workers' compensation judge's subject matter jurisdiction over the Orleans Parish School Board's claim for a credit or offset against the Gayle pay that Ms. Garnier received.
Pursuant to La. Const. Art. V, § 16, the legislature enacted La. R.S. 23:1310.3E which provides:
... [T]he workers' compensation judge shall be vested with original, exclusive jurisdiction over all claims or disputes arising out of this Chapter[1], including but not limited to workers' compensation insurance coverage disputes, employer demands for recovery for overpayment of benefits, the determination and recognition of employer credits as provided for in this Chapter, and cross-claims between employers or workers' compensation insurers for indemnification or contribution. [Emphasis supplied.]
In determining what workers' compensation benefits an employee is entitled to receive, the legislature further provides for the reduction of the benefits in certain circumstances. La. R.S. 23:1225C(1)(c) contemplates a reduction of benefits if the employee is receiving a benefit "under disability benefit plans in the proportion funded by an employer." La. R.S. 23:1225C(4) states:
If a conflict arises between the application of the provisions of this Section [1225] and those of any other Louisiana law or contract of insurance, the provisions of this Section shall control.
In Garrett v. Seventh Ward General Hospital, 95-0017 (La.9/25/95), 660 So.2d 841, 843, the Louisiana Supreme Court explained that the purpose of La. R.S. 23:1225C(1)(c) and 1225C(4) was the prevention of "duplicative benefits from different parts of the over all [sic] system provided by the employer and thereby recover more than the amount of his or her actual wages." See also Evans v. Orleans Parish School Board, 97-1911 (La.App. 4 Cir. 11/26/97), 703 So.2d 201. Garrett holds that a workers' compensation judge is statutorily charged with preventing a duplication of benefits; by implication, the workers' compensation judge is required to offset other disability benefits that the employee is receiving from the employer when determining the workers' compensation benefit to which the employee is entitled.
Gayle pay is a disability benefit plan provided by the employer, Orleans Parish School Board. La. R.S. 17:1201. To the extent that any conflict exists between La. R.S. 17:1201 and La. R.S. 23:1225, the *1239 latter statute mandates that it controls. It therefore follows that a workers' compensation judge has subject matter jurisdiction to consider the amount of the workers' compensation benefits under Title 23, to be offset by Gayle pay; but the workers' compensation judge may not question or modify the amount of the Gayle pay itself.
NOTES
[1] The term "Gayle pay" is derived from Gayle v. Porter, 239 So.2d 739 (La.App. 4th Cir. 1970), and refers to "salary paid to a teacher on extended sick leave, less the amount paid to a substitute teacher." Dagenhardt v. Terrebonne Parish School Bd., 94-1672, p. 1, n. 2 (La.2/20/95), 650 So.2d 1161, 1162.
[2] In its opposition to Ms. Garnier's motion for summary judgment, OPSB represents that it paid Ms. Gamier weekly workers' compensation benefits of $349 from January 23, 1998 to March 4, 1998.
[3] She also raised an issue regarding her retirement. Given our disposition of this matter, that issue is not pertinent.
[4] Dr. Manning's findings and opinion arc discussed elsewhere in this opinion.
[5] At trial, she testified that she planned to work for forty years, but the accident in question rendered her disabled and caused her to have to take an early retirement.
[6] Although the WCJ refers to that date as February 1999, the record clearly reflects that was a typographical error and that the correct date is February 1998.
[7] The other reasons she gave were her inability to stay alert and focused, sleeping with the medication, and inability to exercise.
[8] Ms. Garnier disagreed with Dr. Rozas's reference to her arriving for an appointment in pain as a result of having spent "the greatest portion of the day at the shopping mall." She testified that the furthest she was capable of going was the grocery store and that "men and women see shopping center different ways. A shopping center could be a grocery store." She also testified that she had trouble even going to the grocery store and that she had to get another of her doctors to authorize a handicap license plate so that she could park closer at the grocery store.
[9] Although Ms. Garnier suggested in her deposition that Dr. Rozas recommended she receive such chiropractic treatment, Dr. Rozas testified in his deposition that he saw no indication of any need for a chiropractic program.
[10] Although Dr. Guillaume's handwritten notes documenting that referral to Touro Pain Clinic are in the record, neither a formal report nor deposition testimony of Dr. Guillaume appears in the record.
[11] We also note our agreement with OPSB's contention that the WCJ did not err in discounting the opinion of Dr. Manning, the court-appointed expert. Even the opinion of a court-appointed expert is not conclusive. Green v. Louisiana Coca Cola Bottling Co., 477 So.2d 904 (La.App. 4th Cir.1985).
[12] This type of injury must also meet the requirement of La. R.S. 23:1021(7)(d) that a licensed psychiatrist or psychologist diagnose it and that the diagnosis meets the criteria established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association.
[13] We also note that, although the extent of the history Ms. Garnier gave to her psychiatrist is unclear from the record, it is clear that she failed to tell almost all of her other physicians about both of her prior accidentsa 1990 wheelchair incident and a 1996 motor vehicle accident. As to the physical impact, even assuming it was major, it occurred five years earlier.
[14] Although Ms. Garnier raised the question of unpaid medical expenses before the WCJ, she briefed before this court solely the question of her entitlement to have OPSB fund the Touro Pain Clinic program. Given our finding that the WCJ was not manifestly erroneous in finding she had no continuing disability, we likewise find no error in the WCJ's implicit rejection of her claim regarding the funding of the Touro Clinic program. We decline to address any other unpaid medical expenses given Ms. Garnier's failure to brief that issue.
[15] Ms. Garnier acknowledged that she may have collected overlapping benefitsworkers' compensation contemporaneously with the other types of benefits. OPSB argues that she undisputedly collected overlapping benefits and that it is therefore entitled to an offset or credit.
[1] Chapter 10 of Title 23 of the Louisiana Revised Statutes (which is the entire law respecting the subject of workers' compensation).